# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JEFFREY CRAIG**, | Case No. 3:22-cv-141-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **MARKUS BIGEAGLE**, **DANIEL MARCIANO**, **ANTHONY SMITH**, **STEVE TAYLOR**, **MARK DELONG**, **GRESHAM POLICE DEPARTMENT**, and **CITY OF GRESHAM**, | |
| Defendants. | |

Leonard R. Berman, LAW OFFICE OF LEONARD R. BERMAN, 8630 SW Scholls Ferry Road, Box 242, Beaverton, OR 97008. Of Attorneys for Plaintiff.

Andrew D. Campbell, HELTZEL WILLIAMS PC, PO Box 1048, Salem, OR 97308. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff Jeffrey Craig has sued the Gresham Police Department, the City of Gresham, and individual Gresham Police Officers Markus Bigeagle, Daniel Marciano, Anthony Smith, Steve Taylor, and Mark DeLong (collectively, "Defendants"). In his Amended Complaint, which is the operative pleading in this case, Plaintiff asserts twelve claims under 42 U.S.C. § 1983, alleging violations of his constitutional rights under the First and Fourth Amendments, and three

claims under state law, alleging battery and negligence. ECF 6. Now before the Court are two

motions. First, Defendants have moved for summary judgment against all claims. ECF 37.

Second, Plaintiff has moved for partial summary judgment on his federal claims alleging

violations of his rights under the First and Fourth Amendments. ECF 40. The Court does not

believe that oral argument would assist in resolving the pending motions. *See* LR 7-1(d)(1). For

the reasons that follow, the Court grants Defendants' motion for summary judgment and denies

Plaintiff's cross-motion for partial summary judgment.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden,

"the moving party must either produce evidence negating an essential element of the nonmoving

party's claim or defense or show that the nonmoving party does not have enough evidence of an

essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v.

Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070,

1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving

party need only point out 'that there is an absence of evidence to support the nonmoving party's

case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of

proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of

fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509

F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving

party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that

there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"When cross-motions for summary judgment are at issue, [courts] evaluate 'each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences.'" *Zabriskie v. Fed. Nat'l Mortg. Ass'n*, 940 F.3d 1022, 1026 (9th Cir. 2019) (quoting *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006)); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one."

*Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

In the early afternoon on January 29, 2020, Plaintiff went to the Rockwood Lounge, a bar in Gresham, Oregon, for a drink. *See* ECF 39-1 at 1. At about 3:30 p.m., the bartender called the Gresham Police Department to report that an intoxicated patron had threatened other customers, punched a door, and was refusing to leave. *See id.*; ECF 38-5. The bartender added that although the individual did not appear to have any weapons, the bartender was concerned that the individual might assault other patrons. *Id*. at 0:23-0:26, 0:50-0:53.

Gresham Police Officers Mark DeLong and Steve Taylor responded. ECF 37-3 at 27:10-12. Officer Taylor entered the bar, found Plaintiff, and escorted him outside. *Id*. at 28:3-8. Shortly thereafter, Gresham Police Officer Marcus Bigeagle arrived. ECF 38-2 at 0:50-1:00. Officer Taylor spoke with patrons inside the bar, who identified Plaintiff as the disruptive individual. ECF 38-1 at 11. Because Plaintiff was wearing a black Gypsy Jokers sweatshirt, Officer DeLong was in a "cautious mode;" Officer DeLong also noticed that Plaintiff's knuckles were bleeding. ECF 37-2 ("DeLong Depo.") at 20:22-21:3, 67:4-10.

Police body camera footage shows that Plaintiff was visibly intoxicated, annoyed by the officers' presence, and refused to give his full name. ECF 38-2 at 01:48-1:52. Plaintiff, however, initially was physically compliant with the officers' directions, even Plaintiff was verbally argumentative. *Id*. at 0:50-3:00. Plaintiff stood still after being told he was not free to leave, stating "that's fine." *Id.* at 1:54-1:58. Nothing in Plaintiff's body language indicated an intent either to flee or to attack the officers.

After Officer Taylor was finished speaking with the other bar patrons, he went outside and confirmed to his colleagues (now including Officer Anthony Smith, who had just arrived)

that Plaintiff was the subject of the 9-1-1 call. ECF 38-4 at 1:10-1:15. By that time, Officers DeLong and Bigeagle had determined that Plaintiff was unable to care for himself and that they had probable cause to believe that Plaintiff had committed the crime of disorderly conduct. DeLong Depo. 62:11-24; ECF 38-3 at 6:25-7:00. Officer DeLong informed Plaintiff that the officers intended to search Plaintiff for weapons. ECF 38-2 at 2:57-3:05. Plaintiff initially objected to the search and attempted to push Officer DeLong away; when both Officer DeLong and Officer Bigeagle grabbed Plaintiff's arms, Plaintiff said that the search "sound[ed] good" and that there was no reason for the officers to "get tough." *Id.* at 03:02-03:20. Officers DeLong and Bigeagle held Plaintiff's arms in a wrist lock while Officer Taylor patted him down, finding no weapons. *Id.* at 03:23-03:41.

Plaintiff then expressed discomfort with the wrist lock, stating that he wanted to knee or kick Officer Bigeagle, and Plaintiff became more verbally agitated when the officers refused to let go of his wrists. *Id.* at 4:00-4:36. After again threatening to knee Officer Bigeagle, Officer Bigeagle told Plaintiff that if Plaintiff threatened him again, he would put Plaintiff in handcuffs. *Id.* at 7:22-7:27. Plaintiff then told Officer Bigeagle to put him in handcuffs, commenting that he would rather be in handcuffs than for Officer Bigeagle to continue "torturing" him with wrist locks. *Id.* at 7:27-7:45. The officers then placed Plaintiff in handcuffs. *Id.*

After Plaintiff was in handcuffs, the officers instructed him to sit down. ECF 48-1 at 11:20-11:35. Plaintiff objected and cursed at the officers. *Id.* at 11:20-11:35. Officer Bigeagle then performed a leg sweep that forced Plaintiff to the ground. *Id.* at 11:30-11:35. In response, Plaintiff kicked Officer Bigeagle in the chest. ECF 48-4 at 7:55-7:59. To prevent Plaintiff from further assaulting any officer, the officers rolled Plaintiff onto his stomach and held him down. *Id.* at 7:58-8:09. Officer Bigeagle got on top of Plaintiff's legs. *Id.* Officer DeLong pressed his

knee onto the back of Plaintiff's neck. *Id.* Officer Smith grabbed Plaintiff's left arm. *Id.* Plaintiff alleges that during this scuffle Officer Bigeagle kicked Plaintiff, though the available camera angles do not confirm this, and the available footage shows that no officer kicked Plaintiff other than Officer Bigeagle's leg sweep. After Plaintiff was subdued, he continued to express displeasure with his situation but stopped physically resisting. *Id.* at 8:09-8:58. In less than one minute, Officer DeLong removed his knee from Plaintiff's neck. *Id.* at 8:54-8:58.

Shortly thereafter, Officer Daniel Marciano arrived. ECF 38-2 at 9:10-9:14. Officer Marciano questioned Plaintiff and asked Plaintiff's name, but Plaintiff was evasive in his answers. *Id.* at 9:39-10:00. Plaintiff accused the officers of attacking him, including stating that the officers "twist[ed]" his arm, in an apparent reference to the way Officer Bigeagle held his left arm, and that the officers "kick[ed] and stomp[ed]" his legs, which does not appear in any body camera footage. *Id.* at 9:48-9:52, 10:35-10:40. Officer Taylor retrieved a "hobble restraint," which Officer Bigeagle placed around Plaintiff's ankles. *See* DeLong Depo 57:18-23; ECF 38-1 at 8. Approximately two minutes and forty seconds after Plaintiff was handcuffed, Officer Marciano informed Plaintiff of his *Miranda* rights. ECF 38-2 at 10:08-10:18. Noticing Plaintiff's bleeding knuckles, as well as an abrasion on Plaintiff's left cheek, Officer Marciano called emergency medical personnel to tend to Plaintiff. *See* ECF 38-1 at 7. The medical personnel arrived but did not find Plaintiff's injuries to be significant; after Plaintiff told the medical personnel that he was fine, they left shortly after they arrived. ECF 38-4 at 18:22-20:25. The officers then escorted Plaintiff to Officer Marciano's car, and Officer Marciano transported Plaintiff to Multnomah County Detention Facility for booking. ECF 38-4 at 20:25-22:04; ECF 38-1 at 8. Plaintiff was charged with disorderly conduct and assaulting a public safety officer, but those charges were later dismissed.

**DISCUSSION**

**A.  Defendants' Motion for Summary Judgment**

**1.  Plaintiff's First Cause of Action**

**a.  Claim 1: First Amendment Freedom of Expression**

Plaintiff alleges that his arrest was in retaliation for conduct protected under the First Amendment. Defendants argue that they should be granted summary judgment on this claim because Plaintiff was not engaged in protected conduct at the time of his arrest and that even if he was, that conduct was not a substantial factor in his arrest.

The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). To prevail on a First Amendment retaliation claim, a plaintiff must show that "(1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Capp v. County of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (quoting *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016)). In other words, a plaintiff must establish that a defendant had a retaliatory motive and that this motive was the but-for cause of the plaintiff's injury. *Nieves*, 587 U.S. at 398-99; *see also Hartman v. Moore*, 547 U.S. 250, 260 (2006) ("It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway.").

Here, Plaintiff alleges that his protected conduct was his association with the Gypsy Joker Motorcycle Club.[1] For that association to be protected, the Gypsy Joker Motorcycle Club must be an organization that engages in "expressive association." *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). "The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private." *Id.* "Individuals engage in expressive association when they join with others to pursue a wide variety of political, religious, cultural, or social purposes, including the advocacy of both public and private points of view, the advancement of beliefs and ideas, and the transmission of a system of values." *Sullivan v. Univ. of Wash.*, 60 F.4th 574, 579 (9th Cir. 2023) (cleaned up). Additionally, for conduct to be deemed expressive and thus protected, there must be "(1) an intent to convey a particularized message and (2) a great likelihood . . . that the message would be understood by those who viewed it." *Edge v. City of Everett*, 929 F.3d 657, 668 (9th Cir. 2019) (quotations omitted; alteration in original).

Plaintiff does not explain any point of view that the Gypsy Joker Motorcycle Club seeks to express. In none of his pleadings, including his own motion for partial summary judgment and his response to Defendants' motion for summary judgement, does Plaintiff provide any indication as to any "particularized message" that he intended to convey by wearing a Gypsy Joker sweatshirt. Instead, Plaintiff makes only a conclusory assertion that he "had the right to wear a Gypsy Joker sweatshirt without heightened police scrutiny." ECF 46 at 3. Plaintiff also provides no evidence "evincing that Gypsy Joker Motorcycle Club members advocate a specific political view, stand for a particular public position, are a spiritual or religious group, petition the

---

[1] Defendants argue that Plaintiff was not engaged in any expressive conduct at the time of the encounter. ECF 37 at 16. Plaintiff appears to agree, alleging only a violation of his right to expressive association. *See* Am. Comp. ¶¶ 41-42 (ECF 6).

government about anything, or otherwise imbue any particular meaning to the insignia on their vests." *Nemeth v. Ellena*, 2015 WL 2375982, at *9 (D. Or. May 18, 2025).

The Court's own examination of the evidence, viewed in the light most favorable to Plaintiff, also did not reveal any point of view or system of values, except for Plaintiff's description in his deposition that the Gypsy Joker Motorcycle Club is a "one-percent club," meaning that they subscribe to a lifestyle of being among one percent of motorcycle riders that do not follow the law. *See* ECF 37-1 at 33:15-37:21.[2] However, "the practice of associating with compatriots in crime is not a protected associational right." *United States v. Choate*, 576 F.2d 165, 181 (9th Cir. 1978) (citing *Runyon v. McCrary*, 427 U.S. 160, 176 (1976)). Thus, the record does not reflect any protected message, point of view, system of values, or other particularized expression related to Plaintiff's association with the Gypsy Joker Motorcycle Club. Because Plaintiff has not alleged sufficient facts to show that he was engaged in expressive association, the Court grants Defendants' motion for summary judgment on Plaintiff's first claim.

### b. Claim 2: Fourth Amendment Unreasonable Detention and Seizure of Plaintiff's Person

Plaintiff and Defendants agree that the individual Defendants seized Plaintiff outside Rockwood Lounge in Gresham. Plaintiff alleges, however, that Defendant DeLong detained Plaintiff without probable cause, making the detention unlawful under the Fourth Amendment, and that the other individual Defendants participated in that detention.

It might be that Defendants lacked "probable cause" when they first detained Plaintiff, but the Court need not decide that issue because Defendants did not need probable cause for a

---

[2] Indeed, in that deposition, Plaintiff states that "I kind of like hanging out [with the Gypsy Jokers] because they're not trying to shove that down your throat. *They all don't agree with the same stuff politically or religiously either*." ECF 37-1 at 37:18-21 (emphasis added).

brief investigatory detention. The Fourth Amendment permits brief investigative stops when a law enforcement officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity," a "reasonable suspicion" standard that requires "considerably less than proof of wrongdoing by a preponderance of evidence" and "obviously less than probable cause." *Navarette v. California*, 572 U.S. 393, 396-97 (2014) (cleaned up); *see also Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (describing reasonable suspicion standard as asking whether "the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate" (quotations omitted)); *United States v. Williams*, 846 F.3d 303, 308-09 (9th Cir. 2016) (applying reasonable suspicion test). Reasonable suspicion requires only a "particularized and objective basis" for believing that the person stopped is, or is about to be, engaged in criminal activity. *See United States v. Anderson*, 663 F.2d 934, 940-41 (9th Cir. 1981) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Based on the facts presented, there is no genuine dispute that the individual Defendants had reasonable suspicion of criminal activity in this case. They went to the Rockwood Lounge in response to a 9-1-1 call about a drunken customer threatening other patrons and punching a door. Plaintiff was visibly drunk and argumentative. The officer identified Plaintiff as the customer making threats in the bar and saw that he was visibly drunk in the precise location where a caller had complained about an intoxicated individual causing trouble. This is sufficient to provide reasonable suspicion for detention and further investigation. The Court grants Defendants' motion for summary judgment on Plaintiff's second claim.

###### c.   Claim 3: Fourth Amendment Unreasonable Search and Seizure of Plaintiff's Person

Plaintiff alleges that Defendants lacked both probable cause *and* reasonable suspicion to search Plaintiff's person, arguing that Plaintiff's refusing a search and Plaintiff's visible intoxication do not furnish either. Defendants contend that they had reasonable suspicion that Plaintiff may be armed and dangerous.

"Where an officer reasonably believes that 'the persons with whom he is dealing may be armed and presently dangerous,' the officer may conduct a frisk or 'pat-down' search of that person." *United States v. I.E.V.*, 705 F.3d 430, 432-33 (9th Cir. 2012) (quoting *Terry*, 392 U.S. at 30). The Court applies an objective standard to this inquiry, asking whether a reasonably prudent person would have believed Plaintiff to be armed, *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016), but allows officers to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them," *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Here, the individual Defendants had reasonable suspicion to search Plaintiff. The initial 9-1-1 call indicated that Plaintiff was behaving in an aggressive and threatening manner, and on the officers' arrival, Plaintiff continued to display signs of agitation, suggesting a willingness to be violent. Additionally, Plaintiff was wearing a Gypsy Joker Motorcycle Club sweatshirt. Through their own professional experience, the officers understood the Gypsy Joker Motorcycle Club to be an organization that recently and routinely engages in criminal conduct, sometimes violently and with the use of weapons. Thus, it was reasonable for the officers to suspect that an agitated suspect wearing such clothing might be armed and dangerous. The Court grants Defendants' motion for summary judgment on Plaintiff's third claim.

### d. Claims 4 through 9: Fourth Amendment Excessive Force Claims

Plaintiff asserts six claims against the individual Defendants for using excessive force in violation of his Fourth Amendment rights. These claims align to six different actions that the individual Defendants took during their interaction with Plaintiff: using of wrist lock maneuver, using a leg sweep maneuver, kicking the Plaintiff, "strangling" the Plaintiff, placing a knee on Plaintiff's neck, and using a "hobble restraint." Defendants argue both that they did not use excessive force and that they are entitled to qualified immunity on these claims.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "Whether qualified immunity can be invoked turns on the objective legal reasonableness of the official's acts. And reasonableness of official action, in turn, must be assessed in light of the legal rules that were clearly established at the time the action was taken." *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (cleaned up). "The privilege is an *immunity from suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quotation marks omitted) (emphasis in original). For this reason, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (collecting cases). Qualified immunity, however, is only an immunity from suit for damages, it is not an immunity from suit

for declaratory or injunctive relief. *See L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 1993).

In *Saucier*, the Supreme Court outlined a two-step process for determining the applicability of the qualified immunity doctrine. *See* 533 U.S. at 200. The first step is to determine "whether a constitutional right would have been violated on the facts alleged." *Id*. The second step is to determine "whether the right was clearly established." *Id*. The constitutional issue, however, need not be addressed first in every case. *Pearson*, 555 U.S. at 236 (holding that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). "[R]egardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

To determine whether a government official's conduct violates clearly established law, "a court must ask whether it would have been clear to a reasonable officer that the alleged conduct 'was unlawful in the situation he confronted.'" *Ziglar*, 582 U.S. at 152 (quoting *Saucier*, 533 U.S. at 202). To be clearly established, "[i]t is not necessary . . . that the very action in question has previously been held unlawful. That is, an officer might lose qualified immunity even if there is no reported case directly on point. But in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent." *Id.* (cleaned up). "The 'clearly established' requirement 'operates to ensure that before they are subject to suit, [government officials] are on notice their conduct is unlawful.'" *Eng v. Cooley*, 552 F.3d 1062, 1075 (9th Cir. 2009) (alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Thus, the key inquiry in determining whether an officer has qualified immunity is whether the officer had "fair warning" that his

conduct was unconstitutional. *See Hope*, 536 U.S. at 740; *see also Saucier*, 533 U.S. at 202 (noting that courts need not agree on one "precise formulation of the standard" for the law to be clearly established, as long as "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand"); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) ("Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'" (quoting *Bull v. City & County of San Francisco*, 595 F.3d 964, 1003 (9th Cir. 2010) (en banc))). Courts must avoid the "danger of a rigid, overreliance on factual similarity." *Hope*, 536 U.S. at 742. *See also id.* at 743 (concluding that "[t]he reasoning, though not the holding," in a case "gave fair warning" to reasonable officers "that their conduct crossed the line of what is constitutionally permissible" because the "premise [of the case] ha[d] clear applicability," even though "the facts of the case [were] not identical").

A court in this circuit first looks to binding precedent from the Supreme Court or the Ninth Circuit to determine whether law is clearly established. *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004). After that, "in the absence of binding precedent, [courts] look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." *Id.* (quotation marks omitted).

When considering whether qualified immunity applies, the court must resolve all factual disputes in favor of the party asserting the injury, *Ellins*, 710 F.3d at 1064, but the plaintiff bears the burden of making a showing that the right at issue was clearly established at the time of the alleged violation, *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). Additionally, on summary judgment, "the plaintiff can no longer rest on the pleadings . . . . and the court looks to

the evidence before it (in light most favorable to plaintiff)" when considering qualified immunity. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

Plaintiff fails to meet this burden. In response to Defendants' motion for summary judgment (and in his own motion for partial summary judgment), Plaintiff cites only one case that supports the requisite showing that the conduct at issue violated a clearly established right. The only relevant case that Plaintiff cites is *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007), in which the Ninth Circuit stated that the alleged conduct violated clearly established rights when officers gang-tackled, punched, used a hobble restraint, and placed a knee on the back of the neck of a suspect who was not actively resisting arrest and without first trying less violent means of executing the arrest. *See id.* at 467-70.

Here, the officers used a wrist lock during a constitutionally valid search of an individual whom they reasonably believed to be armed, and they executed a leg sweep when the individual refused to comply with orders to sit down, the validity of which are not challenged in this case. This is a far cry from the egregious conduct described in *Blankenhorn*. Accordingly, that decision does not furnish grounds for finding that Claims 4 or 5 were violations of clearly established rights, and the Court grants summary judgment to Defendants on those two claims.

Moreover, although the Ninth Circuit in *Blankenhorn* held that use of a hobble restraint under the circumstances alleged in that case violated an arrestee's clearly established rights, that determination rested on the fact that the arrestee had not resisted arrest. Here, there is no genuine dispute that Plaintiff kicked an officer, and there is no clearly established constitutional right to be free of a hobble restraint in such circumstances. Indeed, after Plaintiff's kick, police had good reason to restrain his legs. Thus, the Court grants summary judgment to Defendants on Claim 9.

The gang-tackling and punching in *Blankenhorn* are analogous to the kicking and strangulation alleged in Claims 6 and 7. If Plaintiff can show a genuine dispute of material fact on these claims, that would survive Defendants' motion for summary judgment. Here, however, the police body camera footage shows that there is not a genuine dispute that would permit these claims to move forward to trial.

Plaintiff contends that he was kicked and strangled after he was no longer a threat to police. Moreover, Plaintiff's likening of his circumstances to those in *Blankenhorn* suggest an argument that the actions at issue were particularly brutal. Neither of those contentions are true, however. The undisputed video footage shows Plaintiff, while seated on the ground, kicking Officer Bigeagle. Officer Bigeagle and his colleagues quickly responded to subdue Plaintiff. In that brief—and underwhelming—melee, Officer Bigeagle takes a step forward, and it appears that his foot contacts Plaintiff's side. Although it is unclear whether that contact was intentional, there is no genuine dispute regarding the intensity of that contact; it was not intense. The officer leaned down to grab Plaintiff's shoulders. Some video angles leave open the possibility that the officer briefly grabbed Plaintiff's neck, but neither the intent nor the effect of this action is "strangulation," as Plaintiff alleges. The officer's hands do not wrap around Plaintiff's neck, and the officer did not apply pressure to Plaintiff's windpipe to obstruct breathing. Indeed, within seconds, Officer Bigeagle removed his hands completely, when the officers turned Plaintiff onto his stomach to prevent him from kicking again. Thus, the question here is not whether *Blankenhorn* clearly establishes a right to be free from brutal assault when a suspect is not resisting arrest. It is whether *Blankenhorn* clearly establishes a right for a suspect to avoid reasonable use of force designed to subdue a suspect after the suspect has assaulted a police officer. It does not. The Court grants summary judgment to Defendants on Claims 6 and 7.

That leaves Claim 8. The *Blankenhorn* court held a constitutional violation occurs when an officer "pushed [the suspect's] face into the pavement by shoving a knee into the back of his neck" when the suspect was not resisting arrest at the time of that action. 485 F.3d at 478. But that holding was part of a broader context in which the crime at issue was non-violent, the suspect's affect was docile and he was not resisting, and officer's use of his knee was part of a broader, inexplicably violent escalation by police. Here, Plaintiff was suspected of punching walls and threatening bar patrons, had an agitated, indeed belligerent, affect, and kicked Officer Bigeagle. The Court finds no genuine dispute that Plaintiff was subjected to a police response that was proportionate to the situation and reasonably calibrated to do no more than prevent him from further violence against them. The Court grants summary judgment to Defendants on Claim 8.

To summarize, the Court grants Defendants' motion for summary judgment on Plaintiff's Claims 4 through 9, which allege that the individual Defendants violated Plaintiff's Fourth Amendment rights by using excessive force. Many excessive force cases require a jury trial to resolve genuine disputes of fact. This, however, is not one of those cases.

### e.   Claims 10 and 11: *Monell* Liability

Defendant moves for summary judgment on Plaintiff's claims of employer liability against both the Gresham Police Department and the City of Gresham. In Claim 10, Plaintiff alleges that these two Defendants have a custom, policy, and practice of allowing employees to commit the constitutional violations that Plaintiff alleged in Claims 1 through 9. In Claim 11, Plaintiff alleges that these two Defendants acted with deliberate indifference of Plaintiff's rights by failing to properly train, supervise, oversee, control, and discipline their employees.

Both Claim 10 and Claim 11 fail with respect to the Gresham Police Department. An "intergovernmental association" such as a municipal police department cannot be sued under

§ 1983 unless it is a "separate legal entity" from the municipality itself. *Hervey v. Estes*, 65 F.3d 784, 792 (9th Cir. 1995) ("It is only subject to suit if the parties that created [the organization] intended to create a separate legal entity"). The Gresham Police Department is not a separate legal entity from the City of Gresham, and so these claims cannot be brought against it.

A municipality like the City of Gresham is a "person" that may be sued under § 1983. *See Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). To assert a *Monell* claim against a municipal entity, however, a plaintiff first must show an underlying constitutional violation. *See Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) (holding that "the municipal defendants cannot be held liable because no constitutional violation occurred"). Because *Monell* violations are "contingent on a violation of constitutional rights," *id.* and, as discussed above, Plaintiff fails to show a genuine dispute that his constitutional rights were violated, the Court need not analyze whether the City of Gresham could be liable under *Monell*. The Court grants Defendants' motion for summary judgment against Claims 10 and 11.

### f.  Claim 12: Fourth Amendment Wrongful Pat-Down

Plaintiff's final constitutional claim, Claim 12, asserts that the individual Defendants' pat-down of Plaintiff's person violated his Fourth Amendment rights. This claim is essentially the same as Plaintiff's Claim 3. For the same reasons that the Court granted summary judgment in favor of Defendants on Claim 3, the Court grants summary judgment in favor of Defendants on Claim 12.

### 2.  Plaintiff's Second Cause of Action

### a.  Claim 1: Battery

Plaintiff asserts a state law battery claim against the individual Defendants for placing him in wrist locks, kicking him, choking him, strangling him, putting him in hobble restraints, placing a knee on his neck, and patting him down. Oregon Revised Statutes

("ORS") 161.233(1)(a) allows peace officers to "use physical force upon another person only when it is objectively reasonable, under the totality of circumstances known to the peace officer, to believe" "[t]hat the person poses an imminent threat of physical injury to the peace officer or to a third person."[3] Moreover, peace officers are protected from liability for battery when "the physical violence exerted by the officers against plaintiff was no more than necessary to accomplish the legitimate purpose of fulfilling their duty." *Bracken v. Douglas County*, 2023 WL 4886971, at *5 (D. Or. Aug. 1, 2023) (quoting *Gigler v. City of Klamath Falls*, 21 Or. App. 753, 763 (1975)).

As previously discussed regarding Plaintiff's Fourth Amendment excessive force claims, all of the alleged instances of battery, except for use of wrist locks and the pat down, were in response to Plaintiff's action in kicking Officer Bigeagle. The officers thus had legal authority under ORS 161.233 to use reasonable force against Plaintiff. As discussed above, Plaintiff fails to show a genuine dispute of fact on the issue of whether the force employed by the officer was unreasonable.

The wrist locks and pat down preceded Plaintiff's kick against Officer Bigeagle. As also discussed above, however, both occurred as part of a constitutionally valid search of Plaintiff based on individual Defendants' reasonable suspicion that Plaintiff might be armed and dangerous. Such a search is part of the legitimate purpose of fulfilling their duties and represented only minor intrusions that were not more than necessary to do so. The individual Plaintiffs are shielded from liability for battery with respect to the wrist locks and pat down, and

---

[3] This statute also permits peace officers to use physical force in other instances, but those are not relevant to Plaintiffs' claims. *See* ORS 161.233(1)(b).

Plaintiff has failed to show a genuine issue to the contrary. The Court grants Defendants' motion for summary judgment on Plaintiff's state law battery claim.

### b. Claims 2 and 3: Negligence

Plaintiff asserts two claims of negligence. The first is against Officers DeLong and Bigeagle, as well as the City of Gresham, alleging that they "were negligent when they placed Plaintiff in wrist locks, kicked him, choked him, strangled him, put him in hobble restraints, and put a knee on his neck, and patted him down and arrested him." ECF 6 ¶ 181. Defendants argue that under Oregon law, a negligence claim cannot be maintained separately from a § 1983 claim when the two are based entirely on the same facts. Defendant is correct. It is well-established that under Oregon law, a negligence claim may be brought separately from a claim under § 1983 only when the negligence claim is grounded on different facts. *See, e.g.*, *Whitfield v. Tri-Metropolitan Transp. Dist.*, 2009 WL 839484, at *10-11 (D. Or. Mar. 30, 2009); *Shilo v. City of Portland*, 2005 WL 3157563, at *1 (D. Or. Nov. 22, 2005); *Woods v. Gutierrez*, 2012 WL 6203170, at *12 (D. Or. Dec. 12, 2012).

Here, Plaintiff's negligence claim mirrors his constitutional claims for violations of his Fourth Amendment rights. Indeed, the underlying factual allegations for Plaintiff's negligence claim and his Fourth Amendment claims are identical. Plaintiff has not alleged any facts in support of his negligence claim that differ from the facts alleged in support of his Fourth Amendment claims. Thus, Plaintiff's first claim for negligence cannot be maintained.

Plaintiff asserts his second negligence claim against the City of Gresham, alleging negligence in its "hiring, training, supervision, and retention" of the individual Defendants. ECF 6 ¶ 185. As with his first negligence claim, Plaintiff's second negligence claim is nearly identical to his first constitutional claims alleging *Monell* liability, Claim 11. In that claim, Plaintiff alleges that the City of Gresham was deliberately indifferent to Plaintiff's Fourth

Amendment rights because it failed to "train, supervise, oversee, control, and discipline" individual Defendants. *See* ECF 6 ¶¶ 135-66. Further, Plaintiff does not distinguish between his factual allegations as applied to his negligence claim and his factual allegations as applied to his *Monell* claim of deliberate indifference. Indeed, the facts supporting both appear to be the identical. Thus, Plaintiff's second claim for negligence cannot be maintained.

In summary, the Court grants Defendants' motion for summary judgment in favor of Defendants on Plaintiff's state law negligence claims.

## B.  Plaintiff's Motion for Partial Summary Judgment

Plaintiff has filed his own motion for partial summary judgment, arguing for summary judgment on his First and Fourth Amendment claims. ECF 40. For the same reasons that the Court granted Defendants' motion for summary judgment in favor of Defendants on those claims, the Court denies Plaintiff's motion for partial summary judgment.

## CONCLUSION

The Court grants Defendants' Motion for Summary Judgment, ECF 37, and denies Plaintiff's Motion for Partial Summary Judgment, ECF 40.

**IT IS SO ORDERED**.

DATED this 13th day of January, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge